ORIGINAL



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THOMAS JOE MILLER-EL       §
                           §
        Petitioner,        §
                           §
VS.                        §
                           §        NO. 3-96-CV-1992-H
                           §
GARY JOHNSON, Director      §
Texas Department of Criminal §
Justice, Institutional Division §
                           §
        Respondent.        §

**FINDINGS AND RECOMMENDATION OF THE**
**UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the United States magistrate judge pursuant to 28 U.S.C.

§ 636(b) and an order of reference from the district court.  The findings and recommendation of

the magistrate judge are as follow:

## I.

## PROCEDURAL BACKGROUND

Petitioner Thomas Joe Miller-El was convicted of capital murder and sentenced to death.

His conviction and sentence were affirmed on direct appeal.  *Miller-El v. State*, No. 69,677 (Tex.

Crim. App. September 16, 1992), *cert. denied*, 114 S.Ct. 100 (1993).  Petitioner also filed an

application for writ of habeas corpus in state court.  The trial judge made written findings and

recommended that the application be denied.  The Texas Court of Criminal Appeals denied habeas

relief in an unpublished opinion.  *Ex parte Miller-El*, No. 31,001 (Tex. Crim. App. June 17,

1996).  Petitioner then filed this action in federal court.

## II.

### **ISSUES PRESENTED**

Petitioner raises four issues in six grounds for relief. He contends that: (1) the prosecution exercised its peremptory challenges in a racially discriminatory manner; (2) a prospective juror was improperly struck for cause; (3) the trial court failed to conduct a competency hearing and allowed the trial to proceed despite the fact that he was incompetent; and (4) the prosecutor improperly referred to his religious affiliation during sentencing.

## III.

### **STANDARD OF REVIEW**

The standard of review in federal habeas proceedings is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT, Pub.L. No. 104-132, 110 Stat. 1214 (1996). The AEDPA establishes specific standards and procedures for reviewing death penalty habeas cases. *See* 28 U.S.C. §§ 2661-2266. These rules apply to all capital cases pending on or after the effective date of the AEDPA, provided the state has established a mechanism for the "appointment, compensation, and payment of reasonable litigation expenses of competent counsel in state post-conviction proceedings." *Id.* § 2261(a), (b) & (c). Texas does not yet meet these "opt-in" requirements. *Carter v. Johnson*, 110 F.3d 1098, 1104 (5th Cir.), *vacated on other grounds*, 118 S.Ct. 409 (1997). Therefore, the Court must look to the general standards of review under the AEDPA.

A federal court may not grant habeas relief with respect to any claim that was adjudicated on the merits in a state court proceeding unless petitioner shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A state court decision is not "contrary to clearly established federal law" unless a different result was dictated by existing Supreme Court precedent.  *Drinkard v. Johnson*, 97 F.3d 751, 768 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 1114 (1997).  A state fact finding is not "unreasonable" unless the petitioner can rebut the finding by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  An application of law to facts is not "unreasonable" unless "[the] state court decision is so clearly incorrect that it would not be debatable among reasonable jurists."  *Drinkard,* 97 F.3d at 769.[1]

## IV.

## PEREMPTORY CHALLENGES
### (Grounds 1 & 2)

In two related grounds for relief, petitioner argues that the prosecution used 10 of its 14 peremptory challenges to exclude African-Americans from jury service in violation of the equal protection clause of the Fourteenth Amendment.

---

[1] Petitioner argues that *Drinkard* misinterpreted the standard of review for federal habeas cases under 28 U.S.C. § 2254(d)(1).  The *Drinkard* court held that the first clause of the statute--prohibiting habeas relief unless the state court adjudication resulted in a decision that was "contrary to" clearly established federal law--applies only to questions of pure law.  Under this interpretation, a federal court cannot grant habeas relief unless the state court failed to identify the correct rule of law when it adjudicated the claim.  *Drinkard*, 97 F.3d at 767-68.  Petitioner advocates a different interpretation of the "contrary to" clause.  He suggests that the proper inquiry should be whether the Supreme Court had announced a controlling rule of law prior to the time the claim was adjudicated in state court.  If so, a federal habeas court must decide whether the state court decision is "contrary to" that established law.  Otherwise, the "unreasonable application" clause of the statute comes into play and the federal court must determine whether the state court adjudication was untenable under existing Supreme Court authority.  (Pet. Reply at 13-17).

In sum, petitioner maintains that there is no basis for the distinction in the standard of review for "pure legal questions" and "mixed questions of law and fact" under the AEDPA.  Both should be subject to review under the "unreasonable application" clause of section 2254(d)(1) where there is no Supreme Court authority directly on point.  (*Id.*).  *See Drinkard*, 97 F.3d at 778-79 (E. Garza, J., dissenting).  Moreover, petitioner contends that the court's interpretation of the "unreasonable application" clause--making habeas relief available "only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists"--raises serious problems under Article III and the Suspension Clause of the U.S. Constitution.  (Pet. Reply at 20).  These are thoughtful and provocative arguments.  Nevertheless, this Court is bound by the *Drinkard* majority and must follow its holding.  *See Cedillo v. Valcar Enterprises & Darling Delaware Co.*, 773 F.Supp. 932, 936 (N.D. Tex. 1991) (district court is bound by Fifth Circuit precedent).

## A. Applicable Law

The Fourteenth Amendment guarantees every defendant in a criminal case equal protection under the law. *Hernandez v. State*, 347 U.S. 475, 477, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954). This right extends to the jury selection process. *Swain v. Alabama*, 380 U.S. 202, 204, 85 S.Ct. 824, 826, 13 L.Ed.2d 759 (1965); *Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303, 305-08, 25 L.Ed. 664 (1879). Thus, a prosecutor may not use his allotted peremptory challenges to exclude potential jurors solely on the basis of their race. *Swain*, 85 S.Ct. at 837-38. Prior to the *Batson* decision in 1986, the use of peremptory strikes against minorities in any single case was not unconstitutional. *Id.* at 836-37. Rather, a defendant was required to demonstrate a historical pattern of racial bias in the selection of juries. *Id.* at 837-38. The Fifth Circuit explained this burden as follows:

> In order to prevail [on a *Swain* claim], [petitioner] must prove that his prosecutor "had a systematic *and intentional* practice of excluding blacks from traverse juries in criminal trials through the exercise of peremptory challenges, and that this practice continued unabated through petitioner's trial."

*Evans v. Cabana*, 821 F.2d 1065, 1068 (5th Cir.), *cert. denied*, 108 S.Ct. 5 (1987), *quoting Willis v. Zant*, 720 F.2d 1212, 1220 (11th Cir. 1983), *cert. denied*, 104 S.Ct. 3548 (1984) (emphasis in original). Absent evidence of purposeful and systematic discrimination, the prosecutor was entitled to a presumption that he used his peremptory strikes in a proper manner. *Swain*, 85 S.Ct. at 837.

The Supreme Court revisited this issue twenty years later in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Recognizing that it was often impossible for a defendant to prove the systematic exclusion of minorities from jury service over an extended period of time, the Court rejected this evidentiary formulation "as inconsistent with standards that

have been developed since *Swain* for assessing a prima facie case under the Equal Protection Clause." *Id.*, 106 S.Ct. at 1721.[2]  No longer were defendants required to establish a historical pattern of discrimination in the use of peremptory strikes. *Batson* held that "a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection in *his case.*" *Id.* at 1722 (emphasis in original).

A proper *Batson* challenge has three elements.  First, the defendant must raise an inference that the prosecutor excluded potential jurors solely on the basis of race. *Id.* at 1723; *United States v. Wallace*, 32 F.3d 921, 925 (5th Cir. 1994).  A defendant may satisfy this burden in a variety of ways, such as showing a pattern of strikes against minority jurors on the venire panel or statements made by the prosecutor during the voir dire examination. *Batson*, 106 S.Ct. at 1723. Once the defendant makes a *prima facie* case, the burden shifts to the prosecution to articulate a race-neutral explanation for each of the challenged strikes. *Id.* at 1723-24; *Wallace*, 32 F.3d at 925.  This inquiry focuses on the facial validity of the proffered explanation.  "Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (citations omitted); *see also United States v. Perkins*, 105 F.3d 976, 978 (5th Cir. 1997). The trial court then determines whether the defendant has proven purposeful discrimination. *Batson*, 106 S.Ct. at 1724; *Wallace*, 32 F.3d at 925.

When the record contains an explanation for the prosecutor's use of peremptory challenges, the reviewing court need only decide the propriety of the ultimate finding of discrimination.

---

[2]  The Supreme Court observed that the "crippling burden" imposed by *Swain* rendered the prosecution's use of peremptory challenges "largely immune from constitutional scrutiny." *Batson*, 106 S.Ct. at 1721. Indeed, this Court has found only two reported cases in which *Swain* relief was granted. *See State v. Washington*, 375 So.2d 1162 (La. 1979); *State v. Brown*, 371 So.2d 751 (La. 1979). Both cases involved the same prosecutor who essentially admitted that he systematically struck African-Americans from jury service. *Washington*, 375 So.2d at 1163-64.

*Perkins*, 105 F.3d at 978; *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987). This finding is entitled to great deference because it largely turns on an evaluation of the credibility or demeanor of the attorney who exercises the challenge. *Hernandez v. New York*, 500 U.S. 352, 363, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991); *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993). In a federal habeas case, such a finding will not be disturbed "unless it constitutes an unreasonable determination of the facts in light of the evidence presented in the prior state court proceeding." 28 U.S.C. § 2254(d)(2); *see also Carter*, 110 F.3d at 1104.

## B. State Court Proceeding

Petitioner, an African-American, was charged with intentionally causing the death of a hotel clerk during the course of a robbery. The state sought the death penalty. Jury selection began on February 3, 1986 and continued through March 5, 1986. The original venire consisted of 108 prospective jurors, including 18 African-Americans. Six of the African-American jurors were excused by agreement of the parties and one was struck for cause.[3] Both sides were then allowed 15 peremptory challenges. The prosecution used 10 strikes against African-Americans. The defense exercised all 15 of its challenges against non-minorities. One African-American was seated on the jury.[4]

---

[3] The record shows that petitioner agreed to excuse Hilbert Gitchaway, Dora Randle, Vergie Miller, Jerry W. Moseley, Lourice Collier, and Johnnie Holman. (Pet. Supp. Brief, App. 1 at 60). Virginia Smith was struck for cause because of her views on the death penalty. (SF Voir Dire-II 1006).

[4] The only African-American not challenged by the prosecution, Troy L. Woods, was the quintessential state's juror. When asked about his feelings on capital punishment, Woods stated:

> It's too quick. They don't feel the pain . . . Well, what I call punishment is back
> to the old Indian days. Pour some honey on them and stake them out over an ant
> bed. That's the way I feel about it. That's what I call punishment.

(SF Voir Dire-X 3848).

On March 9, 1986--just four days after the jury was empaneled--the *Dallas Morning News*

ran a front-page story about jury selection practices in Dallas County criminal cases.  *See* Steve

McGonigle & Ed Timms, *Race Bias Pervades Jury Selection: Prosecutors Routinely Bar Blacks,*

*Study Finds*, DALLAS MORNING NEWS, March 9, 1986 at A1.  (Am. Petition, Exh. 3).  The

newspaper article examined the racial and ethnic composition of juries in 100 randomly selected

felony trials between 1983 and 1984.  Of 467 African-American jurors qualified to serve in those

cases, 405 were peremptorily challenged by the state.  The study found that African-Americans

were five-times more likely to be removed from a jury panel than whites, and twice as likely to

be struck as Hispanics.  Indeed, 70 of the 100 trials studied during the relevant time period had

no African-American jurors at all.[5]

This article prompted defense counsel to file a motion to quash the jury panel.  The motion

was heard on March 12, 1986.  At the hearing, petitioner attempted to show that the Dallas

County District Attorney's office had an "unofficial policy" of excluding African-Americans from

jury service.  This policy dated back to the late 1950s, but was still being followed by some

prosecutors at the time of petitioner's trial.  Five current or former judges, two prosecutors, and

two defense lawyers testified at the hearing.[6]  One witness, former Assistant District Attorney Jon

_____

[5]  The same authors also studied 15 capital murder trials in Dallas County between 1980 and 1986.  *See* Ed Timms & Steve McGonigle, *A Pattern of Exclusion: Blacks Rejected from Juries in Capital Cases*, DALLAS MORNING NEWS, Dec. 21, 1986 at A1.  (Am. Petition, Exh. 10).  Of 62 African-Americans qualified to serve as jurors in those cases, 56 were struck by the state with peremptory challenges.  Only five African-Americans served on capital murder juries during this time period.  While five of the 15 cases involved African-American defendants, four of those defendants were tried by all-white juries.  Ironically, petitioner was the only African-American defendant to have a trial before at least one member of his own race.

[6]  Among the witnesses to testify at the hearing was Jack Hampton, presiding judge of the 283rd Judicial District Court.  Judge Hampton served as an Assistant District Attorney in the late 1950s.  He recalled being reprimanded by District Attorney Henry Wade after allowing an African-American woman to serve on a jury in a DWI case.  (SF-3/12/86 Hrg. 59-60).  Significantly, Wade still served as Dallas County District Attorney when petitioner was tried in March 1986.

Sparling, testified about a memo he wrote in 1969 on jury selection in criminal cases. (SF-3/12/86 Hrg. 27-57 & Def. Exh. 1). This 19-page document is punctuated with racial, ethnic, religious, and gender-based stereotypes. For example, Sparling advises prosecutors that "[w]ho you select, and what you qualify the panel on will depend on the type of crime, the age, *color* and sex of the [d]efendant . . ." (*Id.*, Def. Exh. 1 at 301) (emphasis added). He goes on to state that "[y]ou are not looking for any member of a minority group which may subject him to oppression" because "[m]inority races almost always empathize with the [d]efendant." (*Id.*, Def. Exh. 1 at 303, 305). Sparling testified that his memo was used to train misdemeanor prosecutors and became part of a manual distributed to all members of the Dallas County District Attorney's office. (*Id.* at 29-30).

At the conclusion of the hearing, the trial judge found that there was "no evidence presented to me that indicated any systematic exclusion of blacks as a matter of policy by the District Attorney's office." (*Id.* at 146). He therefore concluded that petitioner failed to establish a *Swain* violation. (*Id.*). The case proceeded to trial and petitioner was convicted of capital murder on March 26, 1986. One month later, the Supreme Court decided *Batson*.

On direct appeal, petitioner challenged the jury selection process under the more liberal *Batson* standard.[7] The Texas Court of Criminal Appeals found that petitioner had established an

---

Other witnesses testified about more recent incidents of purposeful discrimination against African-American jurors. Harold Entz, presiding judge of Dallas County Criminal Court No. 4, said that one of his prosecutors wanted to shuffle a jury panel "because a predominant number of the first six, eight, or ten jurors were blacks." (*Id.* at 104). This occurred within the past "three or four years." (*Id.* at 103). Another judge, Ed Kinkeade, testified that he thought prosecutors had systematically excluded African-Americans from juries in his court. (*Id.* at 112-13). This observation was confirmed by Judge Larry Baraka, who barred a prosecutor from conducting voir dire in his court after an incident in 1985. (*Id.* at 74-75, 77). Judge Baraka admitted that there had been "a systematic exclusion of blacks by the State from juries" in the past. However, he thought "things had improved considerably" since about 1980. (*Id.* at 75-76).

[7] The Supreme Court has held that *Batson* applies retroactively to cases pending on direct review at the time it was decided. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). Consequently, petitioner was able to raise this claim for the first time on appeal.

inference of purposeful discrimination because the prosecutor used "such a skewed number of strikes on the black veniremen" and "only a single black juror was seated on the panel." *Miller-El v. State*, 748 S.W.2d 459, 460 (Tex. Crim. App. 1988). However, the prosecutor was never given an opportunity to explain his use of peremptory challenges. The case was remanded to the trial court with instructions to conduct a *Batson* hearing. *Id.* at 460-61.

This hearing was held on May 10, 1988. Paul Macaluso, the prosecutor who conducted voir dire, testified as to his reasons for striking each of the 10 African-Americans from the jury panel. The trial court determined that these explanations were race-neutral and negated any inference of purposeful discrimination.[8] Specifically, the court found that: (1) none of the explanations given by the prosecutor were based on group traits; (2) none of the jurors were questioned perfunctorily; (3) there was no disparate examination of the jurors; and (4) the primary reason given to support each peremptory challenge, the juror's reluctance to assess the death penalty, was closely and directly related to the facts of the case. (Supp. Tr. at 6-7). Petitioner challenged these findings on direct appeal. However, the Texas Court of Criminal Appeals found that the prosecutor's explanations were not "patently implausible or so contrary to the evidence as to be unworthy of belief as a matter of law." *Miller-El v. State*, No. 69,677, op. at 2 (Tex. Crim. App. September 16, 1992).

## C. *Swain* Claim

Petitioner seeks federal habeas relief under both *Swain* and *Batson*. He argues that these cases have distinct applications and provide independent grounds for challenging discriminatory

---

[8] The trial court also found that petitioner failed to raise an inference of purposeful discrimination through the state's use of peremptory challenges. (Supp. Tr. at 4). However, this finding appears to be contrary to the decision of the Texas Court of Criminal Appeals. *See Miller-El*, 748 S.W.2d at 460 ("We find that appellant has established an inference as required by the *Batson* court.").

jury selection practices. Petitioner urges this dichotomy so he can take advantage of dicta in *Swain* analogizing a Fourteenth Amendment equal protection case to a Sixth Amendment fair cross-section claim once a *prima facie* showing of systematic discrimination has been made.[9] Since such evidence was presented in this case, petitioner maintains that he is entitled to an inference that the prosecutor used his peremptory challenges in a racially discriminatory manner.

This argument fails for several reasons. First, petitioner misreads *Swain*. While recognizing that "[t]otal exclusion of Negroes by the state officers responsible for selecting names of jurors gives rise to a fair inference of discrimination on their part," the Supreme Court held that "this rule of proof cannot be woodenly applied to cases where the discrimination is said to occur during the process of peremptory challenge of persons called for jury service." *Swain*, 85 S.Ct. at 839. The Court went on to explain:

> Unlike the selection process, which is wholly in the hands of state officers, defense counsel participate in the peremptory challenge system, and indeed generally have a far greater role than any officers of the State. It is for this reason that a showing that Negroes have not served during a specified period of time does not, absent a sufficient showing of the prosecutor's participation, give rise to the inference of systematic discrimination on the part of the State.

*Id.* Thus, *Swain* rejected any analogy to fair cross-section cases without proof that the prosecutor systematically used peremptory strikes against minorities over a period of time. *Id.* at 839-40. Historical evidence, standing alone, was never enough to prove a *Swain* violation.

Nor is there any authority for the proposition that *Swain* somehow survives *Batson*. In fact, *Batson* specifically overruled *Swain*. *Batson*, 106 S.Ct. at 1725 n.25 ("To the extent that

---

[9] The Sixth Amendment guarantees a defendant the right to trial by an impartial jury "drawn from a fair cross-section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 536, 95 S.Ct. 692, 700, 42 L.Ed.2d 690 (1975).

anything in [*Swain*] is contrary to the principles we articulate today, that decision is overruled.").

Moreover, the two cases are wholly complementary with regard to their treatment of historical

evidence. Under *Swain*, a defendant was required to prove systematic discrimination as a

prerequisite to an equal protection claim. *Swain*, 85 S.Ct. at 837-38. This requirement was

abolished in *Batson*. *Batson*, 106 S.Ct. at 1722. However, historical evidence can still be used

to establish a *prima facie* case of discrimination in the jury selection process. *Id.* at 1721-22. A

defendant may show that the prosecutor in his case had a practice of striking minority jurors over

a period of time. It then becomes incumbent upon the prosecutor to explain his use of peremptory

challenges in light of that fact. Regardless of the type of evidence presented, the standard of proof

remains the same. It makes no difference whether the defendant's *prima facie* case is based on

historical evidence or the actions of the prosecutor at trial. The court must consider the "totality

of relevant facts" in determining whether purposeful discrimination exists in any particular case.

Finally, the Supreme Court has held that a defendant may not challenge the composition

of a petit jury on the grounds that it does not represent a fair cross-section of the community.

*Holland v. Illinois*, 493 U.S. 474, 487, 110 S.Ct. 803, 811, 107 L.Ed.2d 905 (1990). Rather,

such a claim applies only to the venire from which the jury is ultimately selected. *Id.*, 110 S.Ct.

at 807. It therefore follows that the standards governing a fair cross-section claim under the Sixth

Amendment are not applicable to an equal protection claim under the Fourteenth Amendment. *Cf.*

*id.* at 806 (rejecting invitation to extend *Batson* standards to Sixth Amendment fair cross-section

claims).

The Court concludes that *Swain* does not provide an independent basis for challenging the

prosecutor's use of peremptory challenges in this case. Petitioner's equal protection claim must

be analyzed under the standard of proof articulated in *Batson*.

### D. *Batson* Claim

Petitioner characterizes the evidence supporting his equal protection claim as "copious and multifaceted." (Am. Petition at 15). This is an understatement. His amended petition contains 202 pages of argument on this point, with citations to numerous state and federal authorities. Succinctly stated, petitioner contends that the jury selection practices employed by the state in his case were unconstitutional because: (1) the prosecutors had a documented history of using peremptory challenges against minorities in other cases; (2) African-American jurors were subjected to disparate questioning on the issue of minimum punishment; and (3) the state accepted non-minority jurors with the same characteristics as African-Americans who were struck by the prosecution. A brief discussion of these arguments, none of which were presented to the state court, is necessary to the disposition of this claim.[10]

### 1. Other Cases

Petitioner maintains that two of the prosecutors in his case, Paul Macaluso and Jim Nelson, "had a history of discriminating against African Americans in jury selection and that this practice continued at his trial." (Am. Petition at 59). As proof of discriminatory intent, he cites two other cases involving the same prosecutors. *Chambers v. State*, 784 S.W.2d 29 (Tex. Crim. App. 1989), *cert. denied*, 110 S.Ct. 2602 (1990); *Dorothy Jean Miller-El v. State*, 790 S.W.2d 351 (Tex. App.--Dallas 1990, pet. ref'd).[11] Both cases were reversed for *Batson* violations. Even assuming that this evidence constitutes a pattern of systematic discrimination, it is only relevant

---

[10] The Court asked the parties to brief the issue of whether petitioner fairly presented the factual basis of his "improper questioning" and "comparative juror analysis" claims in state court. *See* ORDER, 7/28/99. Respondent conceded that these arguments "are subsumed within the broad *Batson* issue and are not tantamount to the presentation of a new claim." (Resp. Supp. Brief at 2). Therefore, the Court will consider these claims on the merits.

[11] Dorothy Jean Miller-El is petitioner's wife. She was convicted of murder and attempted capital murder in a separate trial.

in determining whether petitioner has established a *prima facie* case under *Batson*. The state court already found that petitioner has met this burden. *Miller-El*, 748 S.W.2d at 460. Consequently, the focus shifts to the explanation proffered by the prosecution for its use of peremptory challenges. Historical evidence is of limited value in assessing whether the race-neutral explanations articulated by the prosecutor were a pretext for discrimination *in this case*.

### 2. Improper Questioning

Petitioner also contends that all African-American jurors were subjected to disparate questioning on the issue of minimum punishment. He points out that non-minority "pro-death penalty" jurors were fully informed of the range of punishment for murder and asked whether they could keep an open mind on the subject. However, the prosecutor posed the same question to non-minority "anti-death penalty" jurors and *all* African-American jurors in an open-ended manner. These jurors were asked, "What do you personally feel ought to be the minimum punishment for somebody committing a murder?" (SF Voir Dire-I 307-17). Most of the jurors responded with sentences well in excess of the statutory minimum of five years. When the prosecutor informed the jurors of the actual range of punishment, many felt that the minimum sentence was too lenient. As a result, they effectively disqualified themselves from serving on the jury.[12]

Obviously, petitioner intends to show that the prosecutors were of a mind to discriminate. However, no African-American jurors were peremptorily challenged because of their views on minimum punishment. Nor were any African-Americans struck for cause on that basis. Once again, the relevant inquiry in this case is whether the race-neutral explanations proffered by the

---

[12] Texas law allows the prosecution to challenge a prospective juror who demonstrates "bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon 1989). Thus, the state may strike a juror who cannot agree to consider the minimum punishment. *Phillips v. State*, 701 S.W.2d 875, 884 (Tex. Crim. App. 1985), *cert. denied*, 106 S.Ct. 3285 (1986).

state for its use of peremptory challenges were pretextual. If those reasons withstand scrutiny, there is no equal protection violation. Any evidence about the prosecutor's motivation for asking a question that did not form the basis of a peremptory challenge is simply irrelevant.

### 3. Comparative Juror Analysis

The prosecutor explained that he struck nine African-American jurors because of their attitude toward the death penalty or their reluctance to serve on a death penalty jury.[13] Another African-American was struck because of her views on rehabilitation. Petitioner contends that these explanations were pretextual because non-minorities with the same or similar characteristics were accepted by the state. Consideration of this argument requires a careful review of the voir dire examination of each challenged juror.

### a. Juror Bozeman

Roderick Bozeman was the seventh juror on the venire panel and the first African-American questioned. Bozeman said that he believed in capital punishment, but might have a problem sitting on a death penalty jury. (*Id.* at 282). When asked to explain his answer, Bozeman stated:

> It would be actually the weight of, I guess, thinking about the death penalty and that would be the real thing behind it, I guess. I wouldn't have any problem serving on the jury, I don't think.

(*Id.* at 284). The prosecutor then inquired whether Bozeman could answer the special issues on punishment based solely on the evidence presented at trial, "knowing full well that [it might] result

---

[13] Petitioner admits that four African-American jurors--Linda C. Baker, Anna L. Keeton, Paul Bailey, and Janice Mackey-- were properly challenged because of their extreme reluctance to serve on a death penalty jury. (Am. Petition at 135 n.52).

in the execution of somebody who you personally don't desire to be executed." (*Id.* at 301).[14]
Bozeman responded:

> I don't know.  I would like to think I could, but I don't think I
> could.  If I didn't feel like he deserved it, I don't think I could go
> for the death penalty.

(*Id.*).  A short time later, Bozeman changed his answer.  He said, "I'd have to vote with the proof,

you know, no matter how I felt.  If the answer was yes, then I would have to put yes no matter

how I felt about it." (*Id.* at 306).  The prosecutor struck Bozeman based on his "feelings on the

death penalty" and his "obvious hesitation." (*Id.* at 323).

Petitioner contends that these reasons were pretextual because five non-minority jurors

accepted by the prosecution also had misgivings about the death penalty or their ability to serve

on the jury.[15]  However, such a subjective consideration is not easily assessed from a cold record.

*See United States v. Alston*, 895 F.2d 1362, 1367 n.5 (11th Cir. 1990) ("The attributes relied upon

by the prosecutor in striking potential jurors are not always easily compared . . . and often require

an evaluation of the degree to which the prospective juror manifests the stated attribute.").

---

[14] Three special issues are submitted to the jury at the conclusion of the punishment phase of a capital murder trial.  These questions are:

> (1)    Whether the conduct of the defendant that caused the death of the
> deceased was committed deliberately and with the reasonable expectation that the
> death of the deceased or another would result?

> (2)    Whether there is a reasonable probability that the defendant would
> commit criminal acts of violence that would constitute a continuing threat to
> society?

> (3)    Whether the conduct of the defendant in killing the deceased was
> unreasonable in response to the provocation, if any, by the deceased?

TEX. CODE CRIM. PROC. ANN. art. 37.071(b)(Vernon 1981).  An affirmative finding on all three issues by a unanimous jury results in a death sentence.  *Id.* art. 37.071(e).

[15] These jurors are identified as Noad O. Vickery, Ronald Salsini, Marie H. Mazza, Gwendolyn Smale, and Joan Weiner.  Ironically, petitioner struck Vickery, Salsini, and Smale.  (Pet. Supp. Brief, App. 1 at 0059).

Disparate treatment cannot automatically be imputed in every situation where the state rejects one juror with the same characteristics as another juror who is accepted. Indeed, the decision to strike a particular juror "may be influenced by intuitive assumptions that are not fatally suspect merely because they are not quantifiable." *United States v. Lance*, 853 F.2d 1177, 1181 (5th Cir. 1988). *See also Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir.), *cert. denied*, 118 S.Ct. 102 (1997) (both prosecutor and defense counsel must be allowed to make credibility determinations when exercising peremptory challenges).

The record does not reflect the demeanor of Bozeman or the non-minority jurors who expressed doubts or hesitancy about the death penalty. The tone of voice, facial expressions, and other physical qualities of these juror all bear on the assessment of whether their hesitation was merely passing or more deeply-rooted. The trial judge personally observed the proceedings and accepted the prosecutor's explanation for striking Bozeman. The Court must defer to that credibility determination. *Hernandez*, 111 S.Ct. at 1869; *Bentley-Smith*, 2 F.3d at 1373.

Nor is the fact that Bozeman later affirmed his ability to assess the death penalty necessarily dispositive. The use of peremptory challenges is often influenced by intuitive assumptions. *Lance*, 853 F.2d at 1181. The prosecutor is certainly allowed to conclude that a juror's initial indecision may not bode well for the state. *See Caldwell v. Maloney*, 159 F.3d 639, 655-56 (1st Cir. 1998), *cert. denied*, 119 S.Ct. 1152 (1999) ("[T]he prosecutor 'had no obligation either to ignore [the juror's comments about her reluctance] or to accept at face value [the juror's] prediction that, in the end, [she] could put aside [her] problem and do it right.'") (citation omitted). Such "gut reactions" are the essence of a peremptory challenge.

### b. Juror Fields

Billy Jean Fields was the second African-American juror struck by the state. A

considerable portion of his voir dire examination focused on the special issue concerning future

dangerousness. The prosecutor asked, "What sort of evidence do think would aid you . . . in

deciding whether or not this is the type of individual that would probably do something of a

criminal nature again?" (SF Voir Dire-I 419). Fields responded that he would want information

about the defendant's background. (*Id.* at 420, 422). The following colloquy then occurred:

> Q: [BY PROSECUTOR]. Let me just ask you briefly: What does
> that word probability mean to you in that connotation?
>
> A: [BY JUROR]: Well, it means is there a possibility that he will
> continue to lead this type of life, will he be rehabilitated or does he
> intend to make this a life-long ambition.
>
> Q: Let me ask you, Mr. Fields, do you feel as though some
> people simply cannot be rehabilitated?
>
> A: No.
>
> Q: You think everyone can be rehabilitated?
>
> A: Yes.
>
> Q: I'm just curious. How would you ever know that there is
> somebody that--well, you said something earlier, but I can't
> remember exactly what it was, about whether or not somebody
> could be rehabilitated in conjunction with one of my questions
> earlier. You said that would tell you whether or not somebody
> could possibly be rehabilitated?
>
> A: Well, I think you're talking about the fact of whether or not
> it was premeditated. It may be far-fetched, but I feel like, if a
> person has the opportunity to really be talked about God and he
> commits himself, whereas he has committed this offense, then if he
> turns his life around, that is rehabilitation. . . . I feel like when an
> individual has really been truly reached by someone reading the
> word of God to him and they are repentant and they do have a real
> act of contrition, they can be rehabilitated and that's been
> demonstrated.

(*Id.* at 423-24). Despite his feelings about rehabilitation, Fields testified that he could answer the special issues according to the evidence. (*Id.* at 425-26). The prosecutor challenged Fields because he "made the comment that any person could be rehabilitated if they find God . . . and the fact that we have a concern that his religious feelings may affect his jury service in this case." (*Id.* at 451).

Petitioner insists that this explanation was merely a pretext for discrimination. In support of this argument, he points out that three non-minorities also voiced belief in the power of rehabilitation but were accepted for jury service by the state.[16] A comparison between jurors is not probative unless they are similarly situated. *See Hicks v. Johnson*, 186 F.3d 634, 637 (5th Cir. 1999), *cert. denied*, ___ S.Ct. ____, 2000 WL 46097 (U.S. January 20, 2000); *United States v. Jimenez*, 77 F.3d 95, 100-01 (5th Cir. 1996). Here, the record shows that Fields had much stronger feelings on the subject of rehabilitation than the other jurors. Fields believed that *any* person could be rehabilitated. (SF Voir Dire-I 423-24). By contrast, two of the non-minorities accepted for jury service were willing to consider the possibility of rehabilitation or parole in an appropriate case. (*Id.* Voir Dire-IV at 1614-15; Voir Dire-VIII at 3314). The other non-minority juror testified only that younger defendants with no prior criminal record should "be given a chance to have rehabilitation." (*Id.* Voir Dire-XI at 4583-84). Once again, the mere fact that Fields was willing to set his personal feelings aside does not preclude the state from using a peremptory challenge against him. The prosecutor was entitled to strike Fields because of his deep-seated religious beliefs about rehabilitation. *See Caldwell*, 159 F.3d at 655-56; *Lance*, 853

---

[16] These jurors are identified as Noad O. Vickery, Sandra Hearn, and Kevin Duke.

penalty might not serve any purpose. (*Id.* Voir Dire-III 1532). Clearly, his feelings on the subject were more ambivalent than the non-minority jurors accepted by the state. This indecision, coupled with the fact that the state still had nine peremptory strikes remaining, adequately supports the prosecutor's race-neutral explanation for challenging Warren.

### d. Jurors Kennedy, Rand & Boggess

Three other African-American jurors--Wayman Kennedy, Edwin Rand, and Carrol S. Boggess--were struck by the prosecution because of their answers to certain questions about the death penalty. There is ample support in the record to support the exercise of these peremptory challenges.

All three jurors voiced concerns about sitting on a death penalty jury or imposing capital punishment in this type of case. Kennedy testified that the death penalty was only appropriate in "extreme cases . . . like a mass murder," and that a life sentence was sufficient for murder occurring during a robbery. (*Id.* Voir Dire-V 2176, 2178). He repeatedly refused to take a firm position on his ability to assess the death penalty until he heard the evidence. (*Id.* at 2182-94). Rand acknowledged that he had doubts about his ability to participate in assessing the death penalty. At first, he told the prosecutor that "somewhere along the line, I would probably think to myself, you know, 'Can I do this?' You know, right now I say I can, but tomorrow I might not." (*Id.* Voir Dire-IV 1805-06). Later, Rand said that he could impose a death sentence if warranted by the evidence. (*Id.* at 1809-11). Boggess was even more direct. Although she would serve on the jury if selected, Boggess said that "I wouldn't want to serve and I wouldn't want to have that responsibility to do that . . ." (*Id.* at 2008).

Petitioner argues that the views expressed by these African-American jurors were similar to those of non-minorities who were accepted by the state. However, the record does not support

this assertion. None of the non-minority jurors identified by petitioner ever said that the death

penalty was not appropriate for a murder committed during the course of a robbery or that they

did not want to serve on the jury. Moreover, some of the African-American jurors were struck

because of their reluctance or hesitancy in answering questions about the death penalty. These

subjective qualities are best judged by the trial court. *See Hernandez*, 111 S.Ct. at 1869; *Bentley-*

*Smith*, 2 F.3d at 1373.

### 4. Conclusion

Petitioner has adduced a considerable amount of evidence showing that the Dallas County

District Attorney's office had an unofficial policy of excluding African-Americans from jury

service in years past. There is no other explanation for the appalling statistics brought to light by

the *Dallas Morning News* in March 1986. Several judges and defense lawyers confirmed that

prosecutors often used peremptory challenges against African-Americans and other minorities for

no apparent reason other than race. Then there is the "Sparling Memo"--the article on jury

selection that taught Dallas County prosecutors to strike prospective jurors on the basis of race,

religion, ethnicity, and gender. Although this evidence is disturbing, it is not dispositive of

petitioner's *Batson* claim.

In order to prove an equal protection violation, petitioner must show that the prosecutor

used peremptory challenges to purposefully exclude African-Americans from the jury in *his case*.

The historical evidence cited by petitioner helps him establish a *prima facie* case of discrimination.

However, he also must demonstrate that the race-neutral explanations offered by the prosecution

were merely pretextual. This heavy burden is heightened by the onerous standard of review in

federal habeas cases. Here, the trial court found that "the primary reasons for the exercise of the

challenges against each of the veniremen in question, their reluctance to assess or reservations

concerning the imposition of the death penalty, were closely and directly related to the facts of the case" and negated any inference of discrimination. (Supp. Tr. at 6-7). The record supports this determination. Consequently, the finding is not "unreasonable." *See* 28 U.S.C. § 2254(d); *Drinkard*, 97 F.3d at 769. This ground for relief is without merit and should be overruled.[19]

## V.

## CHALLENGE FOR CAUSE
### (Ground 5)

Next, petitioner contends that the trial court improperly excused a prospective juror for cause based on her reluctance to impose the death penalty.

### A. Applicable Law

The Sixth Amendment to the United States Constitution guarantees a defendant the right to trial by an impartial jury. U.S. CONST. amd. VI. This prevents the imposition of punishment in a capital case by a jury organized to guarantee a death sentence. *Witherspoon v. Illinois*, 391 U.S. 510, 521-22, 88 S.Ct. 1770, 1776-77, 20 L.Ed.2d 776 (1968). Still, a potential juror may be excused for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), *quoting Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). Juror bias need not be proved by "unmistakable clarity." *Witt*, 105 S.Ct. at 852. Rather, the trial judge has discretion to determine whether a prospective juror can faithfully and impartially apply the law. *Id.* at 852-53.

---

[19] The Court also notes that an African-American served on the jury. The Fifth Circuit has suggested that this may be sufficient to negate a claim of purposeful discrimination. *See United States v. Ratcliff*, 806 F.2d 1253, 1256 (5th Cir. 1986), *cert. denied* 107 S.Ct. 1625 (1987) (no hint of racial discrimination where two of the remaining twelve jurors were black).

This determination is entitled to a presumption of correctness and should be reversed only in a "clear case." *Id.* at 854 n.9, *quoting Reynolds v. United States*, 8 Otto 145, 98 U.S. 145, 156-57, 25 L.Ed. 244 (1879).

## B. Discussion

All potential jurors were questioned about their feelings on capital punishment. One juror, Joyce Willard, explained her views on the subject as follows:

> Well, I feel that--of course, I know the bible says an eye for an eye and a tooth for a tooth, but to go further into detail, I feel like if you go and have premeditated thoughts about doing somebody bodily injury, then yes I do believe in the death penalty. If murder was not the utmost in your mind, them I'm not real sure what I--I don't know if I can give you an answer on that or not. I have mixed emotions about that.

(SF Voir Dire-VIII 3092). Willard later expressed reservations about imposing the death penalty for a murder that was not "premeditated." (*Id.* at 3095-96). The prosecutor told Willard that premeditation was not an element of capital murder. Rather, the state was only required to prove that the defendant "did knowingly or intentionally cause the death of an individual" while in the course of committing robbery. (*Id.* at 3098-99). After the prosecutor explained the elements of the offense in more detail, Willard said:

> [I]f it is proven and you have proved that this gentlemen has done these two things, if he went in there and intentionally caused someone--in the process he killed someone and it was proven that this happened--I don't know if there were any witnesses or what, but--I would have to go along with the death penalty then.

(*Id.* at 3102). The prosecutor then asked Willard if she could serve on a death penalty jury. At first she replied:

> That is very difficult for me to decide. Like I say, a human life is on trial here. I know one has been taken and I don't believe in taking a human life, of course. I have always had kind of mixed

> emotions, but I felt like somebody who took someone's life should
> be assessed the death penalty. Like I say, I don't--I may be
> contradicting what I told you before. I don't know if I could really
> assess the death penalty to another human life. If it came down to
> the point where it was proven to me beyond a shadow of a doubt
> that he was guilty, then I'm sure I could.

(*Id.* at 3106-07). Willard became equivocal upon further questioning by the prosecutor. (*Id.* at

3110-113). When pressed for a definite answer as to her ability to serve on the jury, Willard

responded "no." The prosecutor then asked:

> Are you telling me that you would not take the oath because you
> don't feel like you are suited or you can serve on this type of a jury?
> If you're telling me that, that's fine.

Willard answered, "I believe that's what I'm telling you." (*Id.* at 3117).

Defense counsel attempted to rehabilitate this juror. He asked whether she could follow

her oath by rendering a verdict based on the law and the evidence. Willard responded:

> If I were on the jury and had to be a part of rendering the verdict,
> I guess it would be--it would be difficult to render a verdict even
> though, like I told you, I do believe in capital punishment. If that
> was what was necessary to do and I were on the jury, I probably
> could go along even though it would be with me for the rest of my
> life.

(*Id.* at 3122). Willard continued to speculate as to her ability to take the oath. At one point

Willard told defense counsel that she "would have to take the oath before I could be on the jury,"

but "I wouldn't want to." (*Id.* at 3124, 3127-28).

Eventually, the trial court intervened. The judge asked Willard if her personal feelings

would interfere with her judgment about the law and the evidence in the case. Willard said,

"Well, knowing me I would probably break down." (*Id.* at 3143). However, she reluctantly

acknowledged her ability to answer the special issues based on the evidence. (*Id.* at 3148-49).

The judge then asked:

> Q: [THE COURT]: [C]an you take the oath to follow the law and
> then discharge your duties as a juror or can you not take an oath and
> do that, that is discharge your duties as a juror, whatever they may
> call you to do? Can you give me a yes or no and there won't be any
> more questions?
>
> A: [WILLARD]: I guess I better answer you no.
>
> Q: Ms. Willard, no, you could not take the oath, right?
>
> A: I don't guess I could after all these things have been put to
> me. I thought maybe I could, but after the way things have been
> presented to me and the way I'm understanding things, if I'm
> understanding correctly, then I don't believe I could.
>
> Q: One final quibble with you. You used the words I think and
> unfortunately--you said no and then you said I think. Is it no, I
> cannot do it or yes, I can do it or--
>
> A: Okay. We'll put no I cannot do it.

(*Id.* at 3150-51).

The trial court excused Willard for cause. Petitioner now contends that Willard only began

expressing doubts about her ability to sit on the jury after the prosecution presented a distorted and

manipulative view of Texas law. He accuses the prosecutor of attempting to sow artificial doubt

in the mind of this juror by "hammer[ing] home the grisly realities of the death sentence, while

offering [her] an 'escape hatch' to avoid jury service by implying that she need not serve if doing

so would trouble her conscience." (Am. Petition at 293). The Court has carefully reviewed the

voir dire examination and finds no evidence of impropriety. Evidently, neither did defense

counsel since he never objected to any of the prosecutor's questions. The lengthy colloquies

involving Willard's ability to take the oath and serve on the jury were the result of her own

indecision and equivocation--not any improper questioning by the prosecutors.

Petitioner further argues that there was no legal basis to strike Willard for cause. He points out that Willard believed in capital punishment. She merely "expressed hesitation and emotional turmoil at the prospect of rendering a verdict that would result in another person being killed." (Am. Petition at 303). If this were the extent of her testimony, Willard might not be disqualified. *See, e.g. Alderman v. Austin*, 663 F.2d 558, 563 (5th Cir. 1981), *aff'd on reh'g*, 695 F.2d 124 (5th Cir. 1983) (jurors who favored capital punishment and could vote to inflict the death penalty were not disqualified because of inability to sign verdict form). However, Willard also stated that she could not take the oath and discharge her duties as a juror. At best, her testimony was ambiguous and contradictory. (SF Voir Dire-VIII 3146, 3148-49, 3115, 3127). The trial court struggled with this issue and concluded that "[Willard's] view about participating in the death penalty process would prevent or substantially impair her performance of her duties as a juror in this case." (*Id.* at 3155). As the Supreme Court has noted:

> What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear;" these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law . . . *[T]his is why deference must be paid to the trial judge who sees and hears the jurors.*

*Witt*, 105 S.Ct. at 852 (emphasis added). Such is the case here. The trial judge had an opportunity to observe Willard's demeanor and assess her credibility. He ultimately concluded that she could not take the oath and accept the duties of her office. Petitioner has failed to establish that this determination was "unreasonable . . . . in light of the evidence presented in the

state court." 28 U.S.C. § 2254(d). This ground for relief should be overruled.[20]

## VI.

## COMPETENCY
### (Grounds 3 & 4)

Petitioner raises two arguments regarding his mental competency. First, he contends that the trial court should have conducted a competency hearing. Second, he claims that he was not competent to stand trial.

### A. Applicable Law

Due process prohibits the trial of a defendant who is mentally incompetent. *Godinez v. Moran*, 509 U.S. 389, 396, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993); *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). This means that a defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . . ." *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). *See also Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). The burden of establishing mental incompetency is extremely heavy. In order to obtain habeas relief, a petitioner must show that "the facts are 'sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt'

---

[20] Although not mentioned in his brief, petitioner has provided the Court with a copy of the Findings and Recommendation of Magistrate Judge Charles Bleil in *Troy Dale Farris v. Gary Johnson*, No. 4-94-CV-0142-Y (N.D. Tex. January 21, 1997) (Am. Petition, Exh. 35). The issue presented in *Farris* is similar to the one raised by petitioner in the instant case--whether a prospective juror was improperly excused for cause based on her opposition to the death penalty. Judge Bleil noted that the juror consistently maintained she could answer the special issues on punishment and follow the law given by the court. Consequently, there was no legal basis to challenge the juror for cause. *Farris*, No. 4-94-CV-0142-Y, op. at 55-56.

Unlike the juror in *Farris*, Joyce Willard said that she could *not* take the oath or discharge her duties as a juror. This fact alone distinguishes the two cases. More importantly, Judge Bleil's recommendation was rejected by the district judge. *Farris v. Johnson*, 967 F.Supp. 200, 206 (N.D. Tex. 1997), *aff'd*, 144 F.3d 50 (5th Cir.) (Table), *cert. denied*, 119 S.Ct. 516 (1998). Therefore, *Farris* does not dictate a contrary result.

as to his mental competency at the time of trial." *Dunn v. Johnson*, 162 F.3d 302, 306 (5th Cir.

1998), *cert. denied*, 119 S.Ct. 1507 (1999), *quoting Washington v. Johnson*, 90 F.3d 945, 950

(5th Cir. 1996), *cert. denied*, 117 S.Ct. 1259 (1997).

State courts must employ procedures designed to protect against the trial of incompetent

defendants. *Drope*, 95 S.Ct. at 904-05; *Pate*, 86 S.Ct. at 842-43. A competency hearing is

required "if the evidence raises a bona fide doubt as to the defendant's competency at that time."

*Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980). The trial court should consider: (1) any

history of irrational behavior; (2) the bearing and demeanor of the defendant in court; and (3) prior

medical opinions. *See Dunn*, 162 F.3d at 305; *Reese v. Wainwright*, 600 F.2d 1085, 1091 (5th

Cir.), *cert. denied*, 100 S.Ct. 487 (1979).

### B. Medical Evidence

Petitioner was shot by Houston police officers at the time of his arrest on November 21,

1985.[21] He sustained serious abdominal injuries and was taken to Ben Taub Hospital for

treatment. Surgeons removed part of his intestines, repaired damage to his internal organs, and

performed a double-barreled colostomy. Petitioner remained hospitalized for eight weeks. During

this time, he experienced complications and underwent an exploratory laparotomy to remove

adhesions. Petitioner lost a total of 57 pounds during his hospital stay. He was eventually

discharged to the custody of Harris County officials on January 12, 1986. (Am. Petition, Exh.

18).

---

[21] Petitioner fled to Houston after he killed a motel clerk in Irving, Texas. He was apprehended five days later by Houston police officers. The shooting occurred when petitioner approached one of the officers with a KG99 machine gun as he was attempting to evade arrest. (SF Trial-II 687, 698-704).

Four days later, petitioner arrived at the Dallas County Jail. He complained of pain at his colostomy site and swollen extremities. Petitioner was treated with a variety of medications and placed on a double portion diet to regain weight. Jail records show that petitioner began experiencing chest pain on January 21, 1986. The next day, his symptoms included "chills and fever." Petitioner was given Motrin and Septra, an antibacterial medication. A wheelchair was ordered so he could go to court. However, petitioner no longer needed a wheelchair by the time jury selection began on February 3, 1986. (*Id.*, Exh. 21 & 22).

At the end of the first week of jury selection, petitioner still had chest pain, chills, and fever. This prompted the trial judge to order a medical evaluation. (*Id.*, Exh. 21). Petitioner was taken to Parkland Hospital on February 10, 1986, where he was diagnosed with pneumonia. He was discharged the same day with a prescription for Darvocet and Erythromycin. (*Id.*, Exh. 24). Jury selection resumed the next morning.

Petitioner continued to complain of chest pain throughout the month of February. He also reported delays in the receipt of his medication.[22] On February 19, 1986, the trial judge asked the jail doctor to determine whether petitioner needed more pain medication for his "well-being." (*Id.*, Exh. 27). Dr. Adrian Collyns responded to this inquiry on February 24, 1986. He advised the judge:

> I have seen this man professionally on a number of occasions
> recently. A chest Xray on Feb. 21, 1986 was done. In my opinion
> he does not now require prescription pain killers.

(Am. Petition at 231).

---

[22] Petitioner alleges that the jail medical staff "continually failed to [administer] his antibiotics and pain medication on schedule." (Am. Petition at 227). The Court acknowledges that the medical records are less than clear on this point. However, this ambiguity does not necessarily establish that the medications were not given as directed.

The next day, defense counsel protested that petitioner had not been getting his medication on a regular basis. Petitioner then told the judge that he had not seen a doctor since his last visit to Parkland Hospital on February 10, 1986.[23] The judge replied:

> [THE COURT]:  Mr. Cunningham and Mr. West, the only thing I can say--first of all, I received a letter from a Dr. Adrienne [sic] H. Collyns, which I'll make part of the Court's file, and it says in so many words, as of February 24th, he does not have the opinion that the Defendant needs pain killer prescriptions.  Now, whether he needs other medicines, I don't know.  I'm not obviously a doctor. I'm going to be guided by what the jail doctors say.  If you-all have any suggestions, I'll be glad to help you in any way I can.
>
> [DEFENSE COUNSEL]:  If he says as of February 24th, that would be yesterday and I don't know if the doctor would say that if he hasn't seen him.
>
> [THE COURT]:  I got this letter delivered to me late yesterday afternoon after we recessed.
>
> [DEFENSE COUNSEL]:  I would ask the Court to at least have whoever that doctor is examine Mr. Miller-El and I would also like to talk with him to see whether or not--what he is using to base that on for Mr. Miller-El's benefit because he tells Mr. West and he tells myself that he's hurting and he needs some medicine.  We don't want him to think that we're not advising the Court.
>
> [THE COURT]:  I'm advised and I'm pretty well guided by what the doctor says.  Let me suggest that you and Mr. West talk to Dr. Collyns or the jail nurse up there and see what their answers are to your questions.  If there is a dispute, I'll be glad--
>
> [DEFENSE COUNSEL]:  Mr. West will track it down, Judge, and we'll go on with Ms. Williams.

(SF Voir Dire-VII 2782-84).

---

[23] Petitioner acknowledged that he had seen a nurse as recently as February 20, 1986, but "they say that they can't do nothing."  (SF Voir Dire-VII 2782).

Petitioner was examined again by Dr. Collyns on February 26, 1986. He complained of constant chest pain that worsened at night. The doctor noted some tenderness and mild swelling over the right inferior scapula area. His lungs were clear with good breath sounds. Based on the results of this examination, Dr. Collyns concluded that petitioner was "fit to attend court." (Am. Petitioner, Exh. 21).

These symptoms persisted for several more days. During this time, petitioner continued to receive antibiotics and non-prescription medications. Then on March 4, 1986--just two days before jury selection concluded--petitioner was taken to Parkland Hospital for treatment of a chest abscess. He developed an infection and returned to the hospital six days later. A follow-up visit was scheduled for March 12, 1986. However, wound care was provided by the jail medical staff instead. (*Id.*, Exh. 21 & 22).

The next entry in petitioner's medical chart is dated March 20, 1986--one week after the trial began. Petitioner complained of soreness around his rib cage and asked to see a doctor. The next day, the following exchange occurred in open court:

> [PROSECUTOR]: Mr. Hall, you have previously identified the man *sitting* at the end of the table--
>
> [DEFENSE COUNSEL]: Your Honor, we'll object. He's not *sleeping*.
>
> [PROSECUTOR]: Well, he was when I was--
>
> [DEFENSE COUNSEL]: Your Honor, I would object to the side-bar remark.
>
> [THE COURT]: Sustained. Disregard that, ladies and gentlemen.

(SF Trial-III 1151) (emphasis added).[24]  The trial court then recessed the proceedings until March 24, 1986.

Shortly after the trial resumed, the state concluded its case-in-chief.  The defense rested without presenting any evidence and both sides closed.  At that point, the trial judge advised petitioner of his right to testify and the consequences of doing so.  Petitioner said that he understood his rights but did not want to testify.  The court then stated:

> [THE COURT]:  [I]t might be a bit late to ask this question, but I've seen no evidence that the Defendant is not competent to either stand trial or make these decisions on his own behalf
>
> [DEFENSE COUNSEL]:  *Your Honor, to the best of my knowledge, Mr. Miller-El is competent and is aware of the facts and knows what is going on.  Is that true, Mr. Miller-El?*
>
> [DEFENDANT]:  *Yes.*
>
> [THE COURT]:  Well, I'll note for the record that throughout the trial including voir dire that this Defendant appeared, from the bench, to participate actively with his lawyers in jury selection decisions and also during the trial as regards cross-examination of witnesses and such as that.  Having heard nothing else, I'm going to find that he makes his decision competently and I, of course, will honor it.

(*Id.* at 1197-98) (emphasis added).

The guilt-innocence phase of the trial ended that day with a finding of guilt.  Later that evening, petitioner complained of nausea and a problem with his colostomy bag.  (Am. Petition, Exh. 21).  The trial judge ordered a medical evaluation to determine whether petitioner was "able to sit thru court."  (*Id.*, Exh. 29).  Petitioner was taken to Parkland Hospital and kept overnight

---

[24]  It is not clear whether the prosecutor actually referred to petitioner as "the man *sleeping* at the end of the table" or whether defense counsel misunderstood the question.  However, the record reflects that petitioner was seated at the end of the table next to his attorneys.  (SF Trial-I 419).

for treatment of a small bowel obstruction. (*Id.*, Exh. 24).

The punishment phase of the trial commenced on March 25, 1986--the same day petitioner was released from the hospital. The following afternoon, the jury sentenced him to death. Petitioner continued to have problems with his colostomy bag and recurrent infections over the next eight months. His condition finally improved after surgeons closed his colostomies in November 1986. (*Id.*, Exh. 21, 24, 30-32).

## C. State Habeas Proceeding

Petitioner did not challenge his mental competency on direct appeal. Instead, he first raised the issue in an application for writ of habeas corpus.[25] Petitioner alleged, *inter alia*, that he was not competent to stand trial due to his debilitating physical injuries, complications arising from his surgeries, and the side effects of pain medication. The state answered these allegations in a written response. Both parties submitted supplemental briefs and expert affidavits in support of their respective positions.

The state relied on the Affidavit of Steven P. Bowers, Medical Director for the Dallas County Jail System. Dr. Bowers reviewed selected portions of petitioner's medical records and a chronology of events prepared by the state. He noted that petitioner was on a number of medications during his trial. However, the only medication that might have affected him to any degree was Darvocet. Dr. Bowers explained that Darvocet is "relatively low in strength compared to other prescription pain medications." According to the medical records, petitioner received two Darvocet tablets three times a day. This is less than the maximum allowable dosage. Dr. Bowers found no indication that petitioner was impaired by any of his medications. He did not exhibit a

---

[25] Petitioner filed his application for post-conviction relief on May 16, 1995--nearly *nine years* after his trial concluded and just hours before his scheduled execution.

pattern of recurrent drowsiness, stupor, being difficult to arouse, or any bizarre behavior. Although petitioner was transported to the hospital several times during his trial, Dr. Bowers noted that each treatment was less than 24 hours in duration. This indicated that most of his medical problems were not serious. Based on this evidence, Dr. Bowers concluded that petitioner was competent to stand trial and assist in his defense. (Am. Petition, Exh. 25).

Petitioner countered with the Affidavit of Ari Kiev, a board-certified psychiatrist. Dr. Kiev reviewed all of petitioner's medical records and evidence submitted by both parties in the state habeas proceeding. This evidence showed that petitioner was in a weakened condition at the time of his discharge from Ben Taub Hospital on January 12, 1986. Petitioner was anemic, had a substantially reduced blood volume, and lost a considerable amount of weight. He also experienced complications with his colostomies, suffered from pneumonia, developed recurrent infections, and frequently complained of pain throughout the trial. Dr. Kiev noted that petitioner was medicated with Darvocet, which "can sometimes produce sedation and dizziness as side effects." He believed that petitioner may have experienced some of these symptoms while taking the medication. Dr. Kiev stated that the combination of these factors, together with an inadequate diet and sleep deprivation, "contributed to an inability of [petitioner] to participate fully and to the best of his normal abilities in the preparation and presentation of his own defense . . ." He then offered this rather bold assessment of petitioner's mental state:

> [Petitioner], because of the depressive effects of a prosthesis such as a colostomy, which reduces the recipient's ability to deal with stress, his physical debilitation and a depressive reaction secondary to his injury and circumstances, which produces apathy and lethargy, had given up and resigned himself to his fate, and was not showing any of the self protectiveness and survival instincts which would otherwise be normal under the circumstances.

Dr. Kiev surmised that petitioner "would have exhibited such a level of passivity and willingness to go along with whatever was offered that it amounted to an expression of suicidal intent to end his life." In his opinion, petitioner should have been evaluated to determine his mental competency. (*Id.*, Exh. 19).

The trial court resolved this conflicting evidence in favor of the state. Specifically, the court found that: (1) petitioner was legally competent both on and off his pain medication; (2) he had the capacity to understand the nature and object of the proceedings against him, consult with his attorneys, and assist in the preparation of his defense; and (3) a competency hearing was not required because "there was no 'bona fide doubt' as to [petitioner's] competence to stand trial." (*Id.*, Exh. 34 at ¶¶ 17-21). The judge based his findings on the exhibits submitted by both parties, the chronology of events prepared by the state, and his own recollection. After conducting an independent review of the record, the Texas Court of Criminal Appeals reached the same conclusion and denied habeas relief. *Ex parte Miller-El*, No. 31,001-01.

### D. Discussion

Petitioner argues that the state habeas proceeding was flawed in four respects: (1) the chronology of events prepared by the state omitted significant information and misrepresented critical facts about his medical condition; (2) the Affidavit of Dr. Steven Bowers was incomplete and unreliable; (3) the trial court ignored his evidence; and (4) the state improperly submitted its proposed findings of fact and conclusions of law to the trial court *ex parte*. As a result of these defects, petitioner contends that he was denied a full and fair opportunity to litigate his competency claim in state court. He therefore seeks a *de novo* review in federal court.

A federal habeas petitioner is entitled to a *de novo* review of a state court's competency determination only "when he makes a showing by clear and convincing evidence to raise threshold

doubt about his competency." *Carter v. Johnson*, 131 F.3d 452, 460 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 1567 (1998), *quoting Lokos*, 625 F.2d at 1261.   In order to raise such a doubt, a petitioner must present facts sufficient "to positively, unequivocally and clearly generate a real, substantial and legitimate doubt" concerning his mental capacity.   *Carter*, 131 F.3d at 460 (citations omitted); *see also United States v. Williams*, 819 F.2d 605, 609 (5th Cir. 1987), *cert. denied*, 108 S.Ct. 726 (1988).   Petitioner has failed to meet this heavy burden.   Nothing in the trial record suggests that he lacked the capacity to understand the proceedings, consult with his lawyers, or assist in the preparation of his defense.   To the contrary, defense counsel told the trial judge that petitioner was competent to stand trial and make decisions on his own behalf.[26] Petitioner agreed with that assessment.   (SF Trial-III 1198).   This fact, standing alone, is persuasive evidence that no *Pate* violation occurred.   *See, e.g. Moody v. Johnson*, 139 F.3d 477, 482 (5th Cir.), *cert. denied*, 119 S.Ct. 359 (1998); *Reese*, 600 F.2d at 1092.

Moreover, the trial judge had an opportunity to observe petitioner's demeanor and behavior on a daily basis over an eight-week period.   The judge ordered at least two medical evaluations to determine whether petitioner was "able to sit thru court." (Am. Petition, Exh. 27 & 29).   None of the doctors who examined petitioner raised any concerns about his mental competency.   In addition, petitioner was questioned by his attorneys and the trial judge at various points throughout

---

[26]   E. Brice Cunningham, lead trial counsel for petitioner, told the state habeas court that he was unaware of the "full gravity" of his client's medical condition.   Cunningham testified:

> After learning more about [petitioner's medical condition] at the time of his trial, Trial Counsel would have brought the matter of Mr. Miller-El's medical condition to the court's attention, requested a Hearing to determine this fact, and would have done whatever was possible to assure Mr. Miller-El's receiving the best possible medical attention, either in the Dallas County Jail, Parkland Memorial Hospital, or some other medical facility that could have dealt with his problem.

(Am. Petition, Exh. 28 at 6).   Significantly, Cunningham never stated that these medical problems prevented petitioner from cooperating with his lawyers or assisting in the presentation of his defense.

the proceeding.  He answered all questions in a direct and coherent manner.[27]  This evidence further undermines petitioner's competency claim.

Petitioner points out that his expert, Dr. Ari Kiev, thoroughly reviewed all the medical evidence and concluded that he was mentally incompetent to stand trial.  The Court acknowledges that the affidavit prepared by Dr. Kiev is more detailed than the affidavit submitted by Dr. Bowers.  However, this does not require the trial court to credit his testimony.  Although Dr. Kiev opined that petitioner was unable to "participate fully and to the best of his normal abilities in the preparation and presentation of his own defense," the trial judge was entitled to rely on his own observations and the testimony of Dr. Bowers in reaching a different conclusion.  *See Carter*, 131 F.3d at 461.  Moreover, the Fifth Circuit has twice found similar expert psychiatric testimony insufficient to prove a "real, substantial and legitimate doubt" concerning mental competency so as to overcome the presumption of correctness attached to state court findings.  *See id.*; *Williams*, 819 F.2d at 608-09.  The fact that the trial court did not mention Dr. Kiev's affidavit in its findings does not overcome this presumption.  *See Carter*, 131 F.3d at 461.

Nor is the anecdotal evidence cited by petitioner sufficient to rebut the state court findings.  Petitioner refers to his repeated requests for pain medication and a comment made by the prosecutor that he was sleeping in court.  There is no doubt that petitioner experienced some pain as a result of his physical injuries, pneumonia, and recurrent wound infection.  However, there is no objective medical evidence that this pain or the side effects of his medication prevented petitioner from assisting in the preparation and presentation of his defense.  Similarly, the

---

[27]  Petitioner attempts to minimize the significance of his answers by characterizing them as single-word responses.  (Am. Petition 238 n.43).  However, the record shows that petitioner answered several questions with complete sentences.  (SF Voir Dire-III 2779-84; Punishment-II 17-19).

prosecutor's ambiguous remark hardly constitutes clear and convincing evidence of mental incompetency. A careful reading of the record discloses that the prosecutor never accused petitioner of sleeping in court. Rather, he asked if a witness could identify petitioner as "the man *sitting* at the end of the table." Defense counsel apparently misunderstood the question and pointed out that petitioner was "*not sleeping*." (SF Trial-III 1151) (emphasis added).

Petitioner has failed to show that there are sufficient facts to "positively, unequivocally and clearly generate a real, substantial and legitimate doubt" as to his mental competency at the time of trial. *Moody*, 139 F.3d at 481; *Carter*, 131 F.3d at 460. Therefore, any defects in the state habeas proceeding were immaterial. This ground for relief is without merit and should be overruled.

## VII.

### RELIGIOUS AFFILIATION
### (Ground No. 6)

Finally, petitioner contends that the prosecutor improperly referred to his religious affiliation and disparaged his beliefs during the punishment phase of the trial.

### A. Applicable Law

The First Amendment protects the right of an individual to join groups and associate with others holding similar beliefs. *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkley*, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). This precludes the state from introducing evidence of a defendant's "abstract beliefs" during the punishment phase of a criminal trial. *Dawson v. Delaware*, 503 U.S. 159, 168, 112 S.Ct. 1093, 1099, 117 L.Ed.2d 309 (1992). However, such evidence is admissible if it is sufficiently related to issues involved in the case. *Id.*, 112 S.Ct. at 1099; *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir.), *cert. denied*,

118 S.Ct. 399 (1997); *Boyle v. Johnson*, 93 F.3d 180, 183 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 968 (1997).

## B. Discussion

Petitioner belongs to a Muslim sect known as the Moorish Science Temple. Members of this religious group typically wear turbans and other distinctive articles of clothing. Approximately two weeks before the murder, petitioner attended a Moorish Feast at the Holiday Inn South in Irving, Texas. Two hotel employees identified petitioner as one of the participants at this function. Donald Ray Hall, the chief night auditor, testified that petitioner "was dressed in like a Moslim [sic] outfit and he had on a turban." (SF Trial-I 420). Philip Bond, the hotel manager, testified that several attendees "had turbans on their heads." (*Id.* at 27). Petitioner did not object to this testimony, and tacitly concedes that this evidence was admissible at the guilt-innocence phase of the trial to prove his identity.[28]

However, petitioner maintains that the prosecutor crossed the line when he questioned Stanley January during the punishment hearing. January testified that he met petitioner as part of a scheme involving illegal drugs. After January described his involvement in this scheme, the prosecutor inquired:

> Q: [BY PROSECUTOR]: Let me ask you: Did Thomas join some sort of political organization?
>
> A: [BY WITNESS]: Muslims, which is the Moorish Science Temple.
>
> Q: Temple of America?

---

[28] The trial court found that petitioner's affiliation with the Moorish Science Temple was relevant "to proving [his] identity as the person who committed the robbery/murder and to demonstrate the reliability of eyewitness Donald Hall's identification . . . " (Am. Petition, Exh. 34 at ¶ 111).

> A:   Yes.
>
> Q:   They are Muslims?
>
> A:   Yes.
>
> Q:   Did they attempt to get you to join their group?
>
> A:   Well, me and Thomas Miller-El had a fall-out because he said that I wasn't into, you know, the Moorish Science Temple of America, and so by me not being into that, he just trusted me a little bit.

(SF Punishment-II 54-55).  The prosecutor made two other references to petitioner's "so-called religious organization" while examining January.  (*Id.* at 69, 80).  He returned to this issue during closing argument:

> There's not a whole lot you can do for Don Hall, but there is about a million and a half other people that still live here and don't want this community turned into a war zone, where people like Miller-El can indulge in conduct that amounts to paramilitary activities, crime, whatever you want to call it: criminal behavior, whatever; whether it's political, philosophical, *religious or whatever*, if it's motivated by the facts in this case that show you it's uncontrollable and insatiable greed, nonetheless, it leaves in its wake what it left here.

(SF Punishment Arg. 5) (emphasis added).

The state court found that the prosecutor did not criticize or degrade petitioner's religious philosophy, beliefs, or practices.  Moreover, the court found that the admission of this evidence did not inflame or prejudice the jury against petitioner on religious grounds.  (Am. Petition, Exh. 34 at ¶ 85).  Petitioner has failed to rebut these findings by clear and convincing evidence.  The passing references to his "so-called religion" and possible religious motivation for the crime are

equivocal at best.[29]  In addition, the jury was already aware of petitioner's religious affiliation because it was properly introduced into evidence during the guilt-innocence phase of the trial. Petitioner has failed to establish an error of constitutional magnitude that justifies federal habeas relief.

## RECOMMENDATION

Petitioner's application for writ of habeas corpus should be denied.

DATED:  January 31, 2000.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE

---

[29]  Indeed, petitioner acknowledges that "it is impossible to determine what role the Moorish Science Temple evidence played in his death sentence."  (Am. Petition at 336).

equivocal at best.[29]  In addition, the jury was already aware of petitioner's religious affiliation because it was properly introduced into evidence during the guilt-innocence phase of the trial. Petitioner has failed to establish an error of constitutional magnitude that justifies federal habeas relief.

## RECOMMENDATION

Petitioner's application for writ of habeas corpus should be denied.

DATED:  January 31, 2000.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE

---

[29]  Indeed, petitioner acknowledges that "it is impossible to determine what role the Moorish Science Temple evidence played in his death sentence." (Am. Petition at 336).